## THE GEORGE W. ELDER.

(District Court, D. Oregon. April 22, 1912.)

### No. 4,879.

1. MARITIME LIENS (§ 3*)—WHAT CONSTITUTES "VESSEL"—EFFECT OF WRECK AND ABANDONMENT.

A vessel, although wrecked, abandoned by her owners and underwriters, and her register closed, but which still retains her hull, though damaged, and her machinery, remains a "vessel" in a maritime sense, and is sub-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ject to dry-dock charges while undergoing repairs after she has been rais-
ed, and to a maritime lien for such charges.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 3; Dec.
Dig. § 3.*

For other definitions, see Words and Phrases, vol. 8, pp. 7297–7301.]

**2. MARITIME LIENS (§ 3*)—VESSEL SUBJECT TO LIEN—UNREGISTERED VESSEL.**

That a vessel is not enrolled or licensed does not affect the question of
jurisdiction to enforce a maritime lien against her, nor does it make any
difference whether she is unfit for sea when a contract is made in her
behalf; if the object and effect of it be to enable her to pursue her busi-
ness upon the sea, it is in its nature maritime.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 3; Dec.
Dig. § 3.*]

**3. MARITIME LIENS (§ 65*)—USE OF DRY DOCK—NEGLIGENCE IN HANDLING
VESSEL.**

Evidence considered, and *held* not to establish negligence or unskillful-
ness in handling a vessel in a dry dock such as to render the owner of
the dock liable for delay in the making of repairs, to be applied in reduc-
tion of its lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 103; Dec.
Dig. § 65.*]

In Admiralty. Suit by the Port of Portland against the steamship
George W. Elder to recover for services rendered in raising and keep-
ing the Elder in dry dock for and while undergoing repairs. Decree
for libelant.

See, also, 159 Fed. 1005.

The Elder, while navigating the Columbia river below Portland and near
Goble, ran upon a rock and sank. This was in January, 1905. Her owners
surrendered her to the underwriters, who, in turn, being unable to raise
her, sold her at auction to J. H. Peterson. Peterson subsequently sold an
interest in the vessel to Charles P. Doe. In the meantime her registration
papers were surrendered. Peterson succeeded in raising the vessel in the latter
part of the spring of 1906, and, Doe becoming interested, she was placed in
the Port of Portland dry dock on Sunday, May 27, 1906; the lifting having
been completed on Monday, the 28th, at 5:30 a. m. She remained in dry
dock undergoing repairs until September 18, 1906, when she was released.
There was no written contract between the Port of Portland and the own-
ers for placing her in dry dock, or respecting the charges to be made for
the services, or for keeping her in dry dock for the time necessary for mak-
ing the repairs. The Port of Portland, however, had previously issued a
schedule of charges for such services, of which the owners of the Elder
were cognizant, and the dockage was simply had at the instance of the
Elder's owners, without further formalities as to contract or agreement.
The injury sustained by the Elder was to her substructure, for the length
of 43 to 45 feet. Her keel was bent upward and broken in three places, and
her keel-plates were likewise stove in and bent and broken. The center of-the
rent was 80 feet aft from the stem, and was of such proportions as that
the ship, without careful handling, was liable to break in two. The ship
when docked occupied three pontoons or sections of the dry dock, the sec-
tions being each 80 feet in length, and separated from each other by a space
of 2 feet, and the vessel's length was 250 feet. The center of the rent in
the ship's bottom came directly over the junction of sections 1 and 2, the
broken part thereby extending over a part of two pontoons of the dry dock.
The dock is provided with locking blocks for holding the sections in place.

Williams, Wood & Linthicum, for libelant.
Milton W. Smith, for claimants.

WOLVERTON, District Judge (after stating the facts as above). All the questions of legal import except one have been practically determined upon the exceptions to the libel. 159 Fed. 1005. The remaining question now presented is whether the Elder was a "vessel" within the meaning of the maritime law, rendering her subject to libel in rem for dry-dock charges, although she had been wrecked, abandoned by her owners and underwriters, and her register closed.

Besides this, there is a question of fact to be determined, which is whether the work of docking the vessel and placing her in alignment suitable to receive her repairs was so negligently and unskillfully done as to delay the contractor in making the repairs, and thus add to the time which the ship was required to be held in dry dock; the claimants claiming that they should have a reduction of the dry-dock charges on that account.

[1] It cannot well be claimed that the Elder in her wrecked condition was not yet a vessel. She was not destroyed as a vessel; she was simply wrecked by a hole being stove in her bottom so that she sank. She was still susceptible of being raised and towed for a number of miles, and placed in a dry dock, where she received her repairs, and henceforth was a ship ready for navigation. Her model was preserved in every way. Neither did she lose any of her propelling machinery or equipment. In the case of Hardy et al. v. The Ruggles, Fed. Cas. No. 6,062, the Ruggles, a steam propeller enrolled and owned in New York, while on a voyage to North Carolina, was burned to the water's edge. The hull, with steam machinery and propelling wheel on board, was towed to Smithfield, Va., and there rebuilt, the old hull being used, with engine frame and boilers standing, but the length of the vessel was somewhat increased; and it was held that this was an old vessel rebuilt, and not a vessel constructed anew. She did not therefore lose her identity, but continued to be a foreign vessel, and not a domestic vessel in Virginia. The court, quoting from Molloy, says:

"If a ship be ript up in parts, and repaired in parts, and taken asunder in parts, yet she remains the same vessel and not another: nay, though she hath been so often repaired that there remains not one stick of the original fabric."

In the case of The Progresso (D. C.) 46 Fed. 292, the facts were these: The steamer in question, while a British vessel registered under the name of "Wells City," sank in the harbor of New York. She was abandoned by her owner, and her registry as a British vessel closed. Being raised by the underwriters, she was purchased by the claimant, with the purpose of procuring for her a register as a vessel of the United States under the name "Progresso." Certain services were rendered the vessel while afloat in the Atlantic basin, before she had obtained an American register, and the question was urged whether she was a vessel in the maritime sense, and whether the services rendered her were maritime. It was held that the Progresso was no less a ship or vessel because she had no national character and was without a name, that she could navigate and would be subject to salvage, and that, while she may not have been

entitled to the rights and privileges of a vessel of the United States, she was nevertheless a vessel capable of being employed in commerce as a ship and a subject of maritime service.

[2] The fact that a vessel is not enrolled or licensed does not affect the question of jurisdiction. The General Cass, Fed. Cas. No. 5,307. And it makes no difference whether a ship is unfit for sea at the time a contract is made in her behalf; if the object and effect of it be to enable her to pursue her business upon the sea, it is in its nature maritime. The Marion S. Harris, 85 Fed. 798, 29 C. C. A. 428.

True, the Elder after her wreck was not a vessel capable of navigation by her own motive power, but she had not been destroyed as a vessel; she was still possessed of her hull, though damaged, and all of her engines, boilers, and equipment were aboard of her, so that, save for the damage, she was still a vessel capable of navigation, and the very purpose of placing her in dry dock was to make suitable repairs so that she might again navigate by her own motive power as she had done before. That her registry was closed for the time being does not, as we have seen, affect the case, and I hold therefore that she was a vessel in the maritime sense receiving repairs, and was subject to reasonable dry-dock charges, and to a maritime lien on account of such charges.

[3] As to the question of fact, the evidence shows that the Elder was lifted in the dry dock on Sunday, May 27, 1906; the work being completed at 5:30 Monday morning, May 28th. The Elder is charged with 1st day May 29, 27 cents per ton (gross tonnage), $461.70; then for 5 days at 10 cents per day per ton, aggregating $855.00; and then for 88 days at 7 cents per day per ton, aggregating $10,533.60; the vessel being released from the dry dock September 18, 1906. Sundays and holidays are excluded from the account. After the ship was put in dry dock, her owners were engaged until June 20th in unloading her damaged cargo, such as was on board when brought to the dock, and in taking out the cement which had been used in great quantities for the purpose of making her rigid and tight so that she could be pumped out, raised, and towed to a suitable place for making her repairs. The cement was poured in, over and about the rent made in her hull, and about the broken keel and keel-plates, and allowed to harden, so that it became necessary to remove the same before the work of repairing could be entered upon. The libelant had nothing to do with removing the cement and cargo, and the actual work of repair began on June 20th. This appears from the Port of Portland's log, and it is not seriously contradicted.

Mr. Doe describes fairly well the damage sustained by the Elder, which is in effect that she was humped up immediately over the place where she struck the rock. The rock being a large one, the ship settled on top of it, and the rock pushed its way up through her bottom, carrying up the keel, frames and plates, stanchions and deck-beams, and everything with it. When she was put in dry dock and her damaged parts removed, she was in a measure broken in two, or to be more accurate, perhaps, greatly weakened at the point of in-

jury. When she went into dry dock, she was out of line because of her injury, which necessitated putting her into line again, so that her keel might be put in true, and frames, keel-plates, and other adjustments properly fitted and made fast and strong.

Now, the principal complaint is that the Port of Portland, by negligent and unskillful management of the dry dock, delayed the work to the extent of 14 or 15 days, resulting in a loss by the amount of the dry-dock charges for that length of time.

The controversy may be solved, I think, by what was done as it respects the keel, and the skill and diligence exercised on the part of the Port of Portland in doing the work of lining up the vessel. It seems that it was necessary to readjust the broken portion of the keel accurately and precisely before the further work of repairs could be proceeded with. The molds or templets were to be taken for the other parts of the ship to be put in place after the keel was adjusted and its exact length ascertained, as the length of the keel-plates and other adjustments depended on that. The consensus of claimants' witnesses is to the effect that the ship was gotten into proper alignment about July 14th, but went out again on the 16th, and was not satisfactorily realigned until August 18th, and that the loss of time occurred between these dates. The fault is laid to the fact that the injured part of the vessel was placed over the division line of pontoons 1 and 2, and not entirely upon one of the pontoons, thus permitting the pontoons to weave about and wrench the vessel at its weakest point— slightly it is true, but sufficiently to delay the work of fitting in the broken part of the keel and getting the proper molds for other parts to be adjusted in order. The adjustment of the pontoons for the proper alignment of the ship was handled by shifting ballast in the pontoons, and it was by this method that the ship was in the end brought into satisfactory alignment. The log of the libelant shows that the piece of keel necessary to the repair, which was manufactured by Moran Bros., at Seattle, Wash., was not received at the dry dock until August 8th. This was but 10 days prior to the ship's alignment to the entire satisfaction of claimants. It seems to have been adjusted readily and at once, its proper and exact length ascertained, and the work of making the molds or templets for fitting and adjusting the other parts necessary for making the repairs proceeded with. Mr. Albert Kelly, who was in charge of the work of repairing the Elder for the Portland Steel Ship Building Company, which company had the contract for making such repairs, says the keel arrived somewhere "around about the 6th or 8th of August," and that the keel-plates came along with the keel.

So there is practically no conflict in the testimony as to the time the keel arrived; and the keel-plates arrived along with it. Kelly further says, in point of fact, he got his keel in early in August, about the 1st or 2d. In this, however, he must be mistaken, for he could not have put it in before it arrived at the dock from the manufacturer. He further testifies, however, that he could not get the keel in until he got the scarphs in the old keel, and that he had to wait until he got the ship in proper line before he could get the proper length in

order to do that, and that he was not very much inconvenienced by the fact that the vessel was not in line up to the time the keel arrived, "probably about four or five days." These four or five days added to the ten days between the 8th and the 18th would make up, excluding Sundays, about the time that claimants contend was lost by delay in lining up the vessel. And referring again to the Port of Portland's log, it shows that the keel and stem, not only arrived on the 8th day of August, but were put in place. Kelly says that it was only the work of an hour to make the pattern for the keel, that is, to take the length of such pattern, the keel being all ready to put in place when it came, except that it was required to be adjusted as to length, when the ship was once in line. The pattern had to be taken before the keel could be cut the proper length. But it appears that the keel was put in place on the 8th of August, so that the pattern must have been taken prior to that time, and to do that the ship must have been in line. The claimants' testimony is not exact as to the time the keel was put in, and it does not specifically refute the testimony that the keel was put in place on the 8th of August.

Frank Walker, who drew up the specifications for and supervised the repairs, testifies that:

"It was absolutely necessary to have the ship's keel in perfect line before any of the molds or templets could be made to the new part of the keel, keel-plates, shell plates, frames, stringers, keelsons," etc.

But on cross-examination he was asked:

"So it took them from the 16th of July until the 18th day of August, at which first date they found they could not hold the dock in line with water (ballast)—it took them that length of time in which to get the dock in line by the shifting and adjusting of the ballast?"

To which he replied:

"They got the dock into line, or practically into line, in a few days after the 16th; but it was the 18th of August before they had her in perfect line."

It is not improbable, therefore, that the molds or templets were made prior to August 8th, and the keel put in on that date, as the libelant's log shows. But beyond this, Walker says that he had no criticism concerning what they did from the 16th of July to the 18th of August in getting the dock in line, and that:

"They did the right thing after the 16th of July. After they found they could not hold the dock there with water, they did the right thing."

In this relation he further testified:

"Q. Well, did they pursue their work with diligence? A. They fairly well succeeded. Q. And with diligence? A. And with diligence."

It is admitted that the dock was a good one of its kind, and it must be further conceded, under the testimony, that the vessel, owing to its badly wrecked condition, was very difficult to put into true alignment. It is probable that this feature attending the repairs had more to do with hindering the work than any unskillful or dilatory management of the dry dock, and it is not proven that the particular manner in which the ship was placed in the dry dock had anything to do with

the delay. Considering all the testimony, I am of the opinion that libelant is not chargeable with the delay complained of by claimants, or any part of it.

I have further examined the testimony touching the smaller items of charge, also contested, and am impressed that they should be allowed.

The decree will be that the libelant recover against the steamship Elder the sum of $4,788, together with interest at 6 per cent. per annum from September 18, 1906.