## THE CLUB ROYALE.
## GREEN et al. v. THE CLUB ROYALE.

District Court, D. New Jersey.

Sept. 11, 1935.

Nathan A. Rubin, of Newark, N. J., for intervening petitioner Charles L. Johnson.

William T. Cahill, of Jersey City, N. J. (Vincent T. Dee, of Jersey City, N. J., of counsel), for libelant Myrtle B. Lynch.

Carl M. Herbert, of Manasquan, N. J. (by Paul R. Cranmer, of Manasquan, N. J.), for libelants Alfred W. Dorrer, Herbert Green, and John W. Falkinburg.

FORMAN, District Judge.

There are consolidated herein the libel of the above-named Herbert Green and those of eight other libelants.

The matter comes before me on the petition of the proctor for the intervening petitioner, Charles L. Johnson, receiver,

wherein he sets forth a description of each of the nine libels. He then alleges in paragraph 4 thereof that answers were interposed by his intervener to all libels except that of one, Robert L. Wack, collector of the borough of Point Pleasant Beach. He says that the answers were generally similar, and claimed that his intervener was entitled to a priority over any of the said libelants by virtue of the fact that he was the holder of a preferred ship mortgage. He further alleges that the libels were referred to a commissioner to determine the amount of each claim, the validity of each lien, and the priorities among the liens, and to report as to the remnants and surplus if any, and to whom the same is due and payable. He further alleges that the commissioner held hearings at which petitioner endeavored to show by the testimony that the "structure" libeled was intended to be used and was used as a restaurant and dance platform. The commissioner filed reports allowing all of the libels. He further sets forth that he received copies of these reports on Monday, May 6, 1935; that on May 8, 1935, petitioner spoke to the commissioner regarding the filing of a supplemental report which "the commissioner informed the petitioner to draw up, and he would look same over with a view to filing such additional supplemental report." He further alleges that he felt that he had until May 11, 1935, within which to file exceptions to the commissioner's report; and that, accordingly, on May 10, he telephoned the commissioner to learn whether he would be in to receive his proposed additional report, and the commissioner informed him that it was too late as the court clerk had presented a final decree to the court which was signed on the morning of that day. He prays that the said decree should be reopened and leave given to his intervener to file exceptions to the commissioner's report, and sets forth that one of his contentions is that the S. S. Club Royale was not a "vessel" within the meaning of the word so as to bring it within the jurisdiction of this court. He specifically admits that such a defense had not heretofore been raised in his answers, but that, notwithstanding, the court not having had jurisdiction over the subject-matter of the suit, his present objection was still timely.

On the said petition an order was issued directing all of the interested parties to show cause why the prayer of the petition should not be granted.

Argument on the same was heard on June 7, 1935.

It appears that most of the libels were filed in October, November, and December of 1934. The marshal reported the sale of the vessel on December 11, 1934, for $5,675, and the intervener petitioned for an order permitting him to answer, which was duly granted on the same day.

Numerous hearings were held during the spring of 1935. The intervener was present at all of these, and contested each of the eight libels. In fact, nearly a thousand pages of such testimony was taken before the commissioner whose costs totaled nearly $1,500.

 Notwithstanding his active participation in the cause during all of this time, the petitioner here did not so much as intimate by a syllable that the res in question was aught but a vessel subject to the maritime jurisdiction of this court. His endeavor was solely directed to the objective of demonstrating that the claims of the libelants were not maritime liens. The res in question was never alluded to by him or any one else, except as a vessel or boat. Pictures were introduced into evidence showing it to be a boat. And to impress such a conviction upon the court, petitioner sought to be preferred out of the funds received from the sale by reason of the allegation in his answers that his security was a preferred ship mortgage. No hint did he give that this court lacked jurisdiction over the subject-matter of this suit until after signature of the court had been appended to the final decree herein.

He comes now to have that decree reopened. Should he prevail, the report of the commissioner must be set aside, the interlocutory decree herein vacated, the sale declared a nullity, and all of the proceedings in this court must be set aside and held for naught. Such complications, together with the fact that the purchaser of the vessel long since towed her out of the district, do not daunt him in his belated complaint that what he actively regarded through all of these almost endless proceedings as a vessel now has suddenly lost its characteristics as such and appears to be only a "structure."

His tardy request to open the final decree would be treated with scant ado were it not for the fundamental law that jurisdiction is essential to the operation and function of a court. The petitioner here could hardly expect his application to be even entertained but for the rule,

"Springing from the nature and limits of the judicial power of the United States, is inflexible and without exception which requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act. On every writ of error or appeal the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it. This rule was adopted in Capron v. Van Noorden, 2 Cranch, 126 [2 L.Ed. 229], decided in 1804, where a judgment was reversed on the application of the party against whom it had been rendered in the circuit court, for want of the allegation of his own citizenship, which he ought to have made to establish the jurisdiction which he had invoked. This case was cited with approval by Chief Justice Marshall in Brown v. Keene, 8 Pet. 112 [8 L.Ed. 885]." Mansfield, C. & L. M. Ry. Co. v. Swan, 111 U.S. 379, at page 382, 4 S.Ct. 510, 511, 28 L.Ed. 462.

And the courts have held the timeliness of such an objection of little relevancy.

"Such a set-off not only has no relation to the transaction out of which this litigation arose, but is not even owned by the claimant herein. It cannot be allowed. Emery Co. v. Tweedie Trading Co. (D.C.) 143 F. 144. This is the only defense contained in the answer. But the claimant now urges by its exceptions, (2) that the commissioner should have found that the subject-matter of this controversy was not within the jurisdiction of admiralty, and (3) should have further found that the demand in suit created no maritime lien even if it be considered enforceable by an admiralty action in personam.

"The libelant rejoins that the claimant by appearing, filing claim, executing the usual stipulation for value, and admitting the jurisdictional averments of the libel, has waived whatever advantage these defenses might have conferred if duly pleaded. Consent, however, cannot give jurisdiction, if it does not exist as to the sub-

ject-matter of the suit; if the contract sued on be not maritime, jurisdiction of the subject-matter is lacking; while if there be no maritime lien there is no foundation for a decree in rem. The Monte A. (D.C.) 12 F. [331], 333." The Oceano (D.C.) 148 F. 131, at page 132.

It seems necessary, therefore, to pause long enough to inquire into the merits of petitioner's claim that the subject-matter of this suit so long and often referred to by him as a vessel is not in fact such, and that this court had no jurisdiction over the same.

The facts gleaned from the testimony and the commissioner's report which seem to be undisputed are that some time prior to December 20, 1933, Charles L. Johnson, the intervening petitioner, for whose benefit the present order to show cause has issued, was appointed by a Connecticut court to be the receiver of a "show boat" named the "Killarney." It was later known as the S. S. Club Royale. Its engines had been removed, but from all other aspects it was a seaworthy vessel, because it was towed from Connecticut through the high seas and moored in New York Harbor following a sale by the said receiver to a corporation known as McCloskey, Inc. The receiver first gave the vendee a bill of sale and took back a chattel mortgage, but later this transaction was altered so that a conditional bill of sale was substituted to represent the transaction. Through default the vessel again came into possession of the receiver. This time he sold the vessel to one Henry Maxwell Cohen, who executed to him as receiver a document on the form of the Department of Commerce entitled a "Mortgage of Enrolled Vessel" which Johnson, the receiver, and intervening petitioner here, has denominated and alleged to be a preferred ship mortgage, which together with the certificate of enrollment and license and other ship's papers the said Johnson recorded in the office of the Collector of the Port of New York. It is only reasonable to presume from this conduct that Johnson regarded the S. S. Club Royale as a vessel, and that it was his clear intent to attempt to comply with the Ship Mortgage Act (46 U.S.C.A. § 911 et seq.).

In due course of time, the said vessel was again towed out of New York onto the high seas and brought into the Manasquan Inlet, in the district of New Jersey, and moored in a navigable branch thereof. There she was conducted as a club for res-

taurant purposes, dancing, and as the petitioner states in his brief for any other business of which the court may, at its discretion, take judicial notice.

The manner of mooring, as indicated by the pictures, was a line at the bow and stern, looped over the timber piling and either taken up or let out in accordance with the flow of tide by means of hand windlasses on the deck of the vessel. She was kept at a distance from the dock or pier by means of buffers, which were only temporary in nature and of normal size to prevent her from chafing. The gangplank was lowered by means of block and fall and was hinged on the vessel, and when raised there was no way to board her. The land end of it rested on a landing platform on the dock. The gangplank rose and fell with the tide, and the pictures in evidence, or shown to me upon this argument, show this gangplank raised.

The chief buttress for petitioner's argument that this was not a vessel is the decision in the case of Hayford v. Doussony (C.C.A.) 32 F.(2d) 605, wherein the court had under consideration the character of a structure in which, similarly to the case at bar, dancing and amusements were conducted. There the court said:

"The evidence showed the following: The Pirate Ship, formerly the United States gunboat Marietta, was an old, dilapidated ship of wood and steel construction, which, at considerable expense, had been refitted as an amusement or dance barge, and, after being so refitted, was towed to the Canal street dock at the foot of Canal street in the city of New Orleans, and lay there from March, 1927, until June, 1927, when it was seized under the warrant issued under the libel filed in this cause. The Pirate Ship was secured to the dock, not like an ordinary ship, but with cables and clamps, the cables having eight or ten turns around clusters of piling. A permanent gangway was built ashore, with a house over it extending to the wharf, the gang plank being secured to the hull with seven or eight one-inch pins. Electric wires and water pipes connected the structure with the shore. The structure was intended by its owner to be used, and was used by him, only as a dance platform permanently secured to the dock at all times when so used, and at no time was used or intended to be used for transporting freight or passengers. None of the libelants were employed as mariners or in any way in the capacity

of seamen. During the time in 1927 when the Mississippi river was high the Pirate Ship, on the order of the manager for the board of port commissioners, and over the protest of appellant, was towed to the St. Andrews street wharf and it was towed' to West End after the seizure in this case.

"The Pirate Ship was. not used, or intended to be used, to carry freight or passengers from one place to another, was not an instrument of navigation or commerce, and performed no function that might not have been performed as well by a floatirìg stage or platform permanently attached to the land. A result of it not being a vessel or instrument of navigation or commerce engaged in any maritime venture was that a maritime lien did not attach for the compensation for the services rendered by any of the libelants. Evansville & Bowling· Green Packet Co. v. Chero Cola Bot+ling Co., 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805; J. C. Penney-Gwinn Corporation v. McArdle (C.C.A.) 27 F.(2d) 324 [59 A.L.R. 1342]. The fact that for purposes foreign to those for which it was intended and adapted to be used it was towed to and from the place where it was used for dancing and amusement was not enough to bring it within the admiralty jurisdiction. The Hendrick Hudson, Fed.Cas.No. 6,355."

The present case may be distinguished from the so-called Pirate Ship Case and others cited by petitioner, in that the S. S. Club Royale floated, and was moored to the dock in the same manner as any other vessel would be moored. This was not so in the case of the Pirate Ship, which the court says was secured, "not like an ordinary ship, but with cables and clamps, the cables having eight or ten turns around clusters of piling. A permanent gangway was built ashore, with a house over it extending to the wharf, the gang plank being secured to the hull with seven or eight one-inch pins." Hayford v. Doussony, supra.

In the case of The Hendrick Hudson, 11 Fed.Cas. p. 1085, No. 6,355, mentioned supra, the res in question was an old hulk of a steamboat used for a saloon and hotel. It would appear therefrom that the possibility of this hulk engaging in commerce or navigation had been definitely set to rest because she was in such condition that she could no longer float at all.

Like distinctions may be drawn between the present and the other cases cited by petitioner, but that it was a vessel within the maritime law was best proven by the ac-

tions of the intervener in his various transactions concerning her, and not by his present words. It is inescapable that to him the S. S. Club Royale was a vessel within the maritime jurisdiction up to the time he knew that his alleged preferred ship mortgage would not obtain for him priority over all other claimants; then she was no longer a vessel. The court sees no merit in this or any other of the proposed exceptions sufficient to impel an opening of the final decree, and the order to show cause ' will be discharged.