**In the Matter of the QUEEN LTD.**
**No. 70–251.**

United States District Court,
E. D. Pennsylvania.
July 27, 1973.

**1010**

Nathan Lavine, Adelman & Lavine, Philadelphia, Pa., for trustees.

Harry Zuckerman, Ehrich & Zuckerman, Miami, Fla., for Manpower & Kelly.

Peter C. Paul, Rawle & Henderson, Philadelphia, Pa., for Cleaning Co. of America; Belcher Oil Co. & Dade Dry Dock.

OPINION

GORBEY, District Judge.

Before this court is the petition of the trustees in bankruptcy for review of an order by the bankruptcy judge dismissing the trustees' objections and allowing proofs of certain claims. The bankruptcy judge determined that certain creditors were entitled to a preference by reason of their maritime liens.[1] These liens arose under 46 U.S.C. § 971, for services rendered to the debtor in conjunction with businesses operated onboard the ship ELIZABETH (formerly the RMS QUEEN ELIZABETH).

■ It is the trustees' position that since the ELIZABETH was withdrawn from commerce and navigation, it was a "dead ship", not subject to a maritime lien. They further argue that the services rendered by certain claimants were not "necessaries", which would give rise to a lien. For the reasons which follow, we reject these contentions and deny the petition for review.

The trustees do not deny that the ELIZABETH is a "vessel" as defined in 1 U.S.C. § 3. That section defines a vessel to include "every description of

1. The history and purpose of maritime liens are somewhat obscure at best. § 11, Benedict on Admiralty states:

> "The principle is that one who has a contract, to which the ship is bound and which is breached, or who, through the instrumentality of the ship, has suffered a wrong that is within the maritime jurisdiction, shall have by way of security or redress, an enforceable interest in the ship."

Holmes in The Common Law, suggested that the liability of a ship for her torts derived from the medieval idea of *deodand*, whereby inanimate objects which had been instruments of physical harm were forfeit to the crown. Holmes traced the ship's liability in contract to the Roman *Hypotheca* which appears to have been the equivalent of our modern nonpossessory security interest. *Benedict* indicates that the contract liens arise from the ship's need to obtain upon her own acount repairs and supplies to keep her moving in commerce. Gilmore and Black, The Law of Admiralty (1957), § 9–20, states:

> "To give rise to a lien, a claim must be in the first instance, maritime. Thus we recur to the question of what is within the jurisdiction of admiralty: what types of structures qualify as 'vessels'; which contracts are maritime contracts; when a tort is a maritime tort, there can be no maritime lien which does not involve a vessel, its cargo or freight and arise out of a maritime contract or a maritime tort, or some peculiarly maritime operation, such as salvage."

The maritime lien has had a federal statutory basis since 1910. Title 46 U.S.C. § 971, reads:

> "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Rather, they urge that a federal maritime lien cannot be sustained against a "dead ship", i. e. one that has been withdrawn from commerce and navigation. In support of this doctrine, we are referred to The Poznan, 9 F.2d 838 (2d Cir. 1925), which disallowed a maritime lien for wharfage and berthage of the vessel after it had been arrested and taken into possession of the United States Marshal. The court of appeals reasoned that no maritime lien may arise for a vessel withdrawn from navigation while in *custodia legis*. The court reasoned:

> " 'The same transaction may be maritime in one case and not maritime in another. As emphasizing this distinction, there is the maxim that "a ship is made to plough the seas, and not to lie at the walls." Hence wharfage rendered to a ship while loading or unloading, or in her regular use as a freight-earning enterprise, is a maritime contract. On the other hand, wharfage to a ship laid up for the winter while waiting for the season to open is not maritime.' "

By allowing the claim, the Supreme Court (274 U.S. 117, 47 S.Ct. 482, 71 L. Ed. 955 (1927)) can hardly be said to have endorsed this reasoning. The Supreme Court, however, decided that the claim did not depend upon the existence of a maritime lien, but rather upon "the most elementary notion of justice", which required that services furnished upon the authority of an officer of the court, for the common benefit of those interested in a fund administered by the court, should be paid for from that fund. The Poznan cases do not establish the dead ship doctrine.

Next, the trustees urge that Hercules Co., Inc. v. The Brig. Gen. Absolom

Baird, 214 F.2d 66 (3d Cir. 1954) is controlling. The district court in *Hercules* denied a maritime lien on the *Baird*, since it was out of service without a certificate of inspection from the Coast Guard. The district court's conclusion of law was apparently premised on its finding that the vessel was a dead ship on which no maritime lien arose. Again, reversal by the court of appeals, which allowed the lien, does more to refute the dead ship doctrine than to advance it. Specifically that court stated:

> "We hold that in 1950 and 1951 the Baird was a vessel and, therefore, a contract to repair and ready her for a voyage is sufficiently maritime to support the jurisdiction of a court of admiralty." [2]

The next case which the trustees urge in support of their proposition is J. C. Penney-Gwinn Corp. v. McArdle et al., 27 F.2d 324 (5th Cir. 1928), cert. denied, 278 U.S. 632, 49 S.Ct. 31, 70 L.Ed. 550. In this case, the court of appeals denied a lien to a dredge engaged in pumping sand from the bottom of the bay to a tract of land for landfill purposes. In denying the lien, the court stated: "It is essential in order to maintain an admiralty lien on a vessel for supplies or advances, that she be at the time engaged in a maritime venture. It is clear that such is not the case here." · That same court, however, in Miami River Boat Yard, Inc. v. 60-foot House Boat, Serial No. SC–40–2860–3–62, 390 F.2d 596 (5th Cir. 1968), reversed the district court which denied a maritime lien. In so doing, the court stated:

> "The District Judge, perhaps influenced greatly by cases turning on the question of *whether an admitted vessel had previously been withdrawn from navigation,* thought that the status of a 'vessel' required an intent that the craft be employed in navigation and commerce either at the mo-

2. The court of appeals viewed the issue before it as the existence of admiralty jurisdiction. They reasoned that if the structure were a dead ship there would be no admiralty jurisdiction, and there-

fore, there could be no maritime lien. The question of jurisdiction is not present in this instance, since jurisdiction is founded in the bankruptcy statute.

ment or in the immediate future, at least under some of our earlier decisions. Notable among these is J. C. Penney-Gwinn Corp. v. McArdle, (5th Cir. 1928) 27 F.2d 324, a case which both here and elsewhere is severely confined to the unique situation of a floating hydraulic dredge being used to make land, not create, improve, or maintain a navigable waterway."
[Emphasis added]

The court relied upon the houseboat status as a vessel in determining whether or not it was capable of being subjected to a maritime lien.

Next, the trustees rely on Hayford v. Doussony, et al., 32 F.2d 605 (5th Cir. 1929). In this case the United States gunboat "Marietta" was renamed "The Pirate Ship" and had been refitted as an amusement or dance barge and attached to a dock at the foot of Canal Street, in New Orleans. "The Pirate Ship" was secured at the dock, not like an ordinary ship, but with cables and clamps. The cables having 8 or 10 turns around clusters of piling. A permanent gangway was built ashore with a house over it, extending to the wharf, and the gangplank was secured to the hull with 7 or 8 one inch pins. Electric wires and water pipes connected the structure to the shore. In this instance, the court of appeals denied a maritime lien. In so doing, they relied upon Evansville and Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926) and J. C. Penny-Gwinn Corp. v. McArdle, discussed *supra*.

The *Evansville* case concerned a wharfboat which sank, damaging the plaintiff's merchandise. At issue was not the existence of a maritime lien, but rather the admiralty limitation of liability. The Supreme Court stated in *Ev-*ansville, at page 21, 46 S.Ct. at page 380:

> "The rule of limited liability of owners of vessels is an ancient one. . . . statutes establishing the rule were enacted to promote the building of ships, to encourage the business of navigation, and in that respect to put this country on the same footing with other countries. . . . The rule should be applied having regard to the purposes it is intended to subserve and the reasons on which it rests."

*Evansville* therefore does not show Supreme Court endorsement for the dead ship exception from maritime liens.

Further, the court of appeals in *Hayford* observed that "The Pirate Ship . . . performed no function that might not have been performed as well by a floating stage or platform permanently attached to the land." Such a structure would not fit within the admiralty definition of a vessel which includes every description of watercraft or other artificial contrivances used, or capable of being used as a means of transportation on the water. In the case sub judice, the bankruptcy judge found that "Throughout the period when the services were rendered or the materials were supplied, the ship was afloat but docked at its berth, that it was tied to the dock by hawser which could be removed at will; that its mooring was temporary, waiting a permanent berth some 7,000 feet away; that its propellers had not been removed, but had been disconnected from its shaft; that its hull was intact and not leaking; [and] that its pumps were operable and its generators, underwater machinery, gear and fittings were intact." [3] Thus, the ELIZABETH was not equivalent to a floating platform permanently attached to the land.

---

3. During September, 1970, at the request of the insurance carrier, the ship was "put on the bottom". (transcript, pp. 246, 248) This involved taking on ballast until the ship was between 39 and 40 feet in its 40 foot berth. (transcript, p. 251) We note that even if a vessel had sunk, it could still be the subject of a maritime lien. The George W. Elder, 196 F. 137 (D.C.Ore.1912), aff'd, 206 F. 268 (9th Cir. 1913). In *Elder*, the court determined that since the vessel was "still susceptible of being raised", it was a vessel to which maritime jurisdiction attached.

None of the other cases which the trustees have referred to us denied a maritime lien because the ship was not actively engaged in navigation and commerce (i. e. it was a dead ship). It would appear that the dead ship doctrine which had some efficacy in the Second Circuit (The Henrick Hudson, 11 Fed. Cas.No.6,355, p. 1085 (S.D.N.Y.1869)) is not recognized in either the Fifth Circuit which is the situs of the ship, or the Third Circuit in which this action was commenced.

The Poznan presented the Supreme Court with an opportunity to rule on the dead ship doctrine. By allowing the claim, it rejected this doctrine. As Judge Staley observed in The Hercules, 214 F.2d 66, footnote 1 at 68, "if the structure were a dead ship, there would be no admiralty jurisdiction". Since The Poznan was a libel in admiralty,[4] the Supreme Court, in reaching the merits, acknowledged that it had jurisdiction. In so doing, it impliedly rejected the dead ship doctrine.

Rather than having the existence of a lien depend on the ethereal quality of the owners' intent to use the ship in commerce and navigation, more uniform results are likely to be achieved, continuing along the line of the "showboat" cases. The Arc, 17 F.2d 446 (S.D.Fla. 1926); The Showboat, 47 F.2d 286 (D. C.Mass.1930); The Club Royale, 13 F. Supp. 123 (D.C.N.J.1936) in which the existence of a lien is dependent upon the degree of permanence of the attachment of the structure to the land.

For that reason, we determined that the ELIZABETH was a vessel to which a maritime lien would attach.

■ Next we must determine whether the bases of these claims are of a type which would support a maritime lien. Claim no. 49, filed by Dade Dry Dock Corporation, in the amount of $1,326.11 is for dry dock services. Title 46 U.S.C. § 971 sets forth "use of dry dock" as a type of service giving rise to a lien. This claim clearly should be accorded lien status.

■ Claim no. 82, filed by Belcher Oil Company, in the amount of $8,599.38 was for fuel and lubricating oil. Such products are "supplies", which the statute enumerates as giving rise to a lien. It does not matter that the fuel supplied to a vessel is used for heating rather than navigation. The Jack-O'-Lantern, 282 F. 899 (D.C.Mass.1922). Claim no. 82, therefore, should also be accorded lien status.

■ Claim no. 50, filed by Cleaning Company of America, in the amount of $32,627.75 was for cleaners who scrubbed the decks, polished the brass and cleaned the corridors through which visitors passed. Such services are not enumerated in the statute, and if they are to be accorded lien status, must come under the category of "other necessaries". Gilmore and Black have expressed the modern concept of "other necessaries" as follows: "The present state of the law is not far from the point where any service which is convenient, useful, and at times necessary, may qualify as a lien under the Act." (§ 9–34). The court of appeals for the third circuit in The Penn, 273 F. 990 (3d Cir. 1921) expressed the concept of necessaries as follows: "The test of what is necessary is what is reasonably needed in the ship's business." In other jurisdictions, claims for fumigating have been held to be included as necessaries. The American, 1931 AMC 197 (D.C.Mass.1930) Cf. The Susquehanna, 3 F.2d 1014 (D.C.Mass.1923); The Ascutney, 278 F. 991 (D.C.Md.1921). It is difficult to make a valid distinction between fumigating and the less vigorous forms of cleaning rendered by the claimants which would indicate that cleaning services are not "reasonably needed in the ship's business." Therefore claim no. 50 is entitled to lien status.

■ Claims no. 37, filed by Manpower, Inc., in the amount of $5,714.82, and no. 38, filed by Kelly Services, Inc., in

---

4. That action was commenced in admiralty (297 F. 345).

the amount of $785.25, are for clerical services and maintenance work. These services were essentially those performed by the crew of the vessel if it had had its full complement. Such services would be reasonably needed in the operation of the vessel ELIZABETH as a maritime tourist attraction. Therefore these claims should also be accorded lien status.

 The claimants in their brief opposing the trustees' petition for review request this court to allow them interest on their claims. The bankruptcy judge has denied this claim for interest. No petition for review of this denial was filed by the claimants as required by § 39(c) of the Bankruptcy Act (11 U.S.C. § 67(c)). Therefore the claimants' request for interest on their claims is denied. In re: Middletown Packing Co., Inc., 199 F.Supp. 657 (D.C.Conn.1961) Cf. Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937).

For the foregoing reasons the trustees' petition for review is denied and the order of the bankruptcy judge is confirmed.