**In re HARBOUR LIGHTS MARINA, INC., Debtor.**

**E. Hanlin BAVELY, Trustee, Plaintiff,**

**v.**

**Raymond G. WANDSTRAT, et al., Defendants.**

**Bankruptcy No. 1–91–06086.**
**Adv. No. 1–91–0231.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 30, 1992.

---

964

E. Hanlin Bavely, Cincinnati, Ohio, trustee/plaintiff.

Randal C. Berning, Cincinnati, Ohio, for Bureau of Workers' Compensation.

Edward M. Craig, Cincinnati, Ohio, for Wandstrat.

Marilyn C. Reece, Cincinnati, Ohio, for Johnston.

David Staadeker, Cincinnati, Ohio, for Bauer.

Trish Locish, Columbus, Ohio, for Bureau of Employment Services.

## DECISION ON MOTIONS FOR SUMMARY JUDGMENT

BURTON PERLMAN, Chief Judge.

Plaintiff/trustee in his first amended complaint seeks to sell "a certain water craft" free and clear of liens pursuant to 11 U.S.C. § 542 and § 543. In his complaint, he also seeks turnover of money from a sale conducted prior to the bankruptcy filing. Thirdly, he seeks avoidance of a preference. The water craft has now been sold, and entitlements with respect to the proceeds are now at issue. While there are numerous defendants named in the adversary proceeding, we are presently concerned with only two of them, Karen R. Bauer and O. Jane Johnston. As we stated in our pretrial order entered March 12, 1992:

> Plaintiff is contesting the validity and/or amounts of liens asserted by defendants Karen Bauer, Jane Johnston, and Ray-

mond Wandstrat. Defendants Bauer and Johnston also contest each other's liens.

Because the documents in the file are many and reference to them would unduly extend this decision, we will state, functionally, what is before the court. Bauer contends that she is a secured creditor in the amount of $15,447.62, secured by a first lien on the furniture, fixtures, and equipment of Harbour Lights Marina, Inc. Johnston asserts that she is entitled to $36,123.35, and that she holds a maritime lien on the marina securing her claim. Johnston has filed a memorandum in opposition to Bauer's claim. Plaintiff has filed a motion for summary judgment seeking avoidance of the liens of both defendants Bauer and Johnston. Opposing memoranda have been filed by both Bauer and Johnston. Johnston has also filed a motion for summary judgment on her claim, and memoranda responsive to that motion have been filed by both the plaintiff and Bauer.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(F) and (K).

In support of his motion for summary judgment, plaintiff depends upon an affidavit of Joseph H. Knue; answers to interrogatories by Bauer, together with attached exhibits; affidavit of auctioneer Frank Crain; answers to interrogatories provided by Johnston; and the deposition of Johnston. In support of her motion for summary judgment, Johnston relies upon a Complaint on a Note and on an Account filed in the Common Pleas Court of Hamilton County, Ohio, which includes as an exhibit a promissory note, and a default judgment entered in the amount of $24,843.82 plus interest of $6,780.41; an affidavit of Johnston; and an affidavit of Joseph Knue (dated July 9, 1992). There are two other affidavits of Joseph Knue before us, one dated June 1, 1992, filed by Johnston. The other is one dated May 24, 1992, which is the one submitted by the plaintiff.

The following background facts are undisputed. In 1985, brothers Joseph and Edward Knue purchased a sunken barge for $6000.00 with the intention of converting it into a marina and floating restaurant. In June, 1986, Harbour Lights Marina, Inc. ("debtor") was incorporated. Its three shareholders were Joseph and Edward Knue, and Karen Bauer, a cousin. Joseph Knue was president and owned 50 of the 100 shares issued, while Edward Knue and Karen Bauer each owned 25 shares. Bauer also was secretary and treasurer of debtor.

In 1987, William and Glenda Richter, friends of Karen Bauer, loaned debtor $14,000.00. In 1989, Bauer paid off the Richter loan and a promissory note and financing statement were executed in Bauer's favor. It is from this right to repayment that Bauer asserts that her rights arise.

At about the same time as the Richter loan, President Joseph Knue had formed a relationship with defendant O. Jane Johnston who desired to take part in debtor's enterprise. In February, 1987, Johnston loaned debtor $15,000.00, which was used to buy supplies and materials to convert the barge into a floating restaurant (hereinafter referred to as the "Craft"). Debtor executed a promissory note for the amount of the loan in Johnston's favor. Johnston loaned to debtor an additional $9,843.00 during 1987. No notes were given in exchange for the additional amounts loaned. Similar to the first 1987 loan, these additional funds were used to buy supplies and materials. When the restaurant opened for business in November, 1987, Johnston became employed by debtor. She performed various jobs while employed by debtor from 1987 through 1989, including work as a waitress, barmaid, cook and receptionist. In 1988, she received a salary of $10,400.00 from debtor.

In October, 1989, Johnston filed suit in state court to collect on her note and in 1990 obtained a judgment in the amount of her note plus interest and costs. In September, 1990, the restaurant permanently closed and the Craft and its contents were sold at auction for $81,950.00, of which $72,904.00 is available for distribution to

creditors.[1] Johnston was told by Joseph Knue that she would be paid when the sale closed on October 4, 1991. When the closing failed to occur as scheduled, Johnston filed a financing statement on October 7, 1991. Debtor filed for bankruptcy four days later on October 11, 1991. On November 15, 1991, this court granted the trustee's postpetition motion to uphold the results of the auction and allow the Craft to be sold pursuant to § 363 of the Code.

We will discuss separately the contentions as to each of the defendants here involved.[2]

1. Bauer Lien.

Karen Bauer filed a proof of claim in this case in the amount of $23,675.23. Bauer alleges that $15,447.62 of the claimed amount is secured. Bauer asserts that she has a lien securing the proceeds of the sale of the equipment, furniture, and fixtures (hereinafter the "contents") located on the premises of the Craft, as well as the steel gangplanks which provided shore access to the Craft. She also asserts that she has a lien against the Craft itself, though she fails to cite any statutory or case law in support of this assertion. As supporting documentation for her secured status in the Craft's equipment, she directs us to a promissory note made out by debtor and signed by all three shareholders in favor of the Richters. The note memorialized the $14,000.00 indebtedness of debtor to the Richters. As noted earlier, Bauer repaid this debt on behalf of debtor with her own funds, and was given a note by debtor in the sum of $12,457.76, plus interest. This note, which was signed by her and Joseph Knue as President of debtor, states that it is secured by duly filed financing statements. This note, however, contains no reference to collateral. The financing statement Bauer furnished provides evidence that the following items may be secured:

Furniture, Fixtures, and Equipment of Harbour Lights Marina, Inc., together with Accounts Receivable, cash on hand, inventory of liquor, food and other items located at 7455 Forbes Road, Cincinnati, Ohio 45233, or such other location as the corporation may from time to time occupy.

This financing statement provides the name of Harbour Lights Marina, Inc. at the bottom, but the space reserved for the debtor's signature is left blank. Karen Bauer signed her name in the space reserved for the signature of the secured party.

The trustee argues that Bauer is unsecured since she failed to execute a security agreement as required by Ohio Revised Code ("ORC") § 1309.14, which sets forth the requirements for the attachment and enforceability of security interests. ORC § 1309. 14(A) provides:

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ... and

(2) value has been given; and

(3) the debtor has rights in the collateral.

Not only did Bauer fail to execute a security agreement, argues the trustee, the financing statement she presents as evidence of her security interest was signed by her in her capacity as an officer of the debtor-corporation. In so doing, asserts the trust-

---

**1.** At the auction, individual bids were received on the following three separate lots: (1) the Craft and the building upon which it stood received a bid of $65,000.00; (2) the steel walkways, or gangplanks, received a bid of $4,500.00; and (3) the restaurant equipment, fixtures, and the like received a bid of $5,000.00. After the individual bids were received, the totality of the Craft and its accompanying property were offered for sale and sold for $81,950.00.

The amount available for distribution to creditors by the trustee, $72,904.00, reflects a reduction of a buyer's premium from the sale price.

**2.** Defendant Wandstrat also asserts a lien against the Craft. The present decision does not deal with his rights. Further proceedings will be necessary for that purpose.

ee, she attempted to grant herself a security interest without corporate authority.

 While the trustee is correct that Bauer lacks a duly signed and executed security agreement, this and other courts have adopted the so-called "composite documents" approach in determining whether a security interest has been granted. Pursuant to this approach, all documents executed between a debtor and creditor are considered in their totality in determining whether a valid security agreement exists. For example, we have held that a security agreement lacking a recitation of the collateral, a financing statement, and a promissory note combined to create a valid security interest. *In re Tomorrow's Inc.*, Case No. 1–81–01438, Adv. Nos. 1–84–0004, 1–84–0065, at 8–9 (Bankr.S.D.Ohio, Nov. 7, 1984), *aff'd* C–1–84–1935 (S.D.Ohio Mar. 27, 1986). In that case, the collateral was adequately identified in the promissory note for the purposes of creating a security interest:

> As security for payment thereof and of all other liabilities and obligations of the undersigned and each of them to Bank, whether absolute or contingent, now existing or hereafter arising due or to become due, the following property has been deposited with and is hereby pledged to the Bank: "Stock & equip." (sic).

*Id.* at 3.

Further, the financing statement referred to the pledged collateral as follows:

> All equipment now owned or hereafter acquired, including, but not limited to those items referred to in a Security Agreement dated July 25, 1978.

*Id.* at 4.

We found that the language contained in the promissory note and the financing statement indicated the debtor's intent to grant a security interest in his equipment. *Id.* at 8–9.

 In *Tomorrow's*, the debtor's intent to create a security interest was central as to whether a security interest could be inferred from extrinsic evidence where no security agreement exists. Further, while parol evidence is not admissible to supplant written terms, it is admissible to inform the inquiry relating to intent where intent is established by the writings. *See In re Walter Willis, Inc.*, 313 F.Supp. 1274, 1278 n. 2 (N.D.Ohio 1970) (whether parties intended to create lease or security interest determined by facts within and outside of lease), *aff'd* 440 F.2d 995 (6th Cir.1971). In the present case, evidence of the intent of Joseph Knue to create a security interest in favor of Bauer in the contents of the Craft is found not only in the promissory note and the financing statement read together, but in the uncontroverted affidavit given by Joseph Knue. In his affidavit dated June 1, 1992, Joseph Knue expressly stated that while he did not intend to give Bauer a security interest in the Craft itself, he did intend to give her a security interest in equipment located within the Craft. Knue's affidavit reads:

> In August, 1987, Bill and Glenda Richter, friends of Karen Bauer's, loaned us $14,000.00 and we agreed to repay them at the rate of $200.00 monthly beginning in September, 1987. We were unable to do this, and the Richter's [sic] had borrowed on their house to get us this money. Really this money was loaned to Karen because the Richters were friends of hers. In September, 1989, the Richter's [sic] needed their money back for another project they were interested in and Karen personally paid them back $12,000 ... Karen then filed a Financing Statement with Hamilton County which I signed, so that she was secured by the corporation's personal property, that is its furniture, fixtures, equipment, inventory and accounts receivable. *I had no intention of granting her a security interest in the barge itself, and I read her financing statement before I signed it to make sure it did not cover the barge, but only the items on the barge.*

Knue Affidavit, at 3–4.

Thus, the financing statement, promissory note, and the foregoing statement from the Joseph Knue Affidavit establish debtor's intent to create a security interest in the contents of the Craft. Further, in light of Joseph Knue's assertion of his intent and the fact that the promissory note bears his

signature in his corporate capacity as President, we reject the suggestion by the trustee that Bauer executed the security interest without corporate authority. We therefore hold that Bauer may assert a security interest in the Craft's contents.

■■■ In regard to Bauer's assertion of a security interest against the Craft itself, however, we reach a different conclusion. Bauer has not set forth any justification, nor can we discover any, for a lien against the Craft. She is not eligible for a maritime lien with respect to the Craft, because, as Johnston correctly argues, Bauer is a shareholder and co-owner of the Craft. Owners may not assert maritime liens against their vessels under maritime law. *See The Kongo,* 155 F.2d 492, 494–95 (6th Cir.1946) (co-owner barred from asserting maritime lien against boat by paying seaman's lien claims and taking an assignment), *cert. denied sub nom. Standard Oil Co. of Louisiana v. Steam Sternwheel Towboat "Kongo",* 329 U.S. 735, 67 S.Ct. 99, 91 L.Ed. 635 (1946). Furthermore, Joseph Knue in his affidavit expressly stated that he did not intend, on behalf of debtor, to grant a security interest in the Craft to Bauer. Bauer therefore can only claim an interest in the proceeds of the sale of the contents of the Craft.

■■ Having established the validity of Bauer's lien relating to the sale proceeds of the contents of the Craft, we must resolve the controversy regarding the scope of her security interest. Bauer argues that the lien covers the gangplanks in addition to the contents located within the Craft. The trustee and Johnston, on the other hand, contend that the gangplanks are not described as collateral within the financing statement and therefore should not be included within the scope of Bauer's lien. The trustee argues further that Bauer's financing statement, which includes a reference to equipment but lacks any reference to the gangplanks, is not sufficiently descriptive to include the gangplanks within the purview of her security interest. ORC § 1309.08 provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

The case law regarding the reasonableness of description in determining whether a particular item of property is covered within a security agreement is highly fact-specific. In their treatise on the Uniform Commercial Code, James White and Robert Summers set forth a two-fold inquiry for determining whether a particular item is within the scope of a security agreement. The first element to be satisfied is whether the writing, under the broadest interpretation possible, might objectively be read as potentially including the property claimed. The second aspect of the inquiry is whether the parties to the agreement intended for the property to be collateral within the scope of the agreement. James J. White & Robert S. Summers, *Uniform Commercial Code,* § 22–4, at 974 (3d ed. 1988).

In the present case, since the promissory note made to Bauer lacks any recitation of collateral, the financing agreement is the sole documentary evidence we have pertaining to the scope of the security interest. According to the White and Summers formulation, the objective part of the inquiry is satisfied, because under the broadest interpretation, there is no reason to believe that the gangplanks are not to included within the scope of "equipment." On the other hand, the subjective aspect is lacking, for none of the furnished documents or affidavits indicate any intent on the part of debtors to convey as security interest to Bauer in the gangplanks specifically. Finally, we reject the argument by Bauer that the term "equipment" as utilized in her financing statement is a residual category of personal property under the Uniform Commercial Code whose inherently broad reach necessarily includes the gangplanks. The gangplanks thus are not subject to the Bauer security interest, and her lien accordingly will attach only to the proceeds of the contents of the Craft.

■■ It seems reasonable and equitable to fix the value of Bauer's lien as a pro rata share of the sale price determined by reference to the amounts bid for the separate components. *See supra,* note 1. The

amount bid for contents at the sale was $5,000.00. While slightly more than the amount derived by strict proration, $5,000.00 reasonably approximates a prorated allocation of the amount available for distribution based upon the separate bids received at the sale. We hold that Bauer is entitled to recover $5,000.00 on account of her lien.

## 2. Johnston Lien.

Johnston asserts that her lien is a maritime lien arising under the Federal Maritime Lien Act, 46 U.S.C. § 31341 (formerly 46 U.S.C. § 971) ("Act"). While Johnston acknowledges filing the UCC financing statement, she now disavows that and bases her claim to the sale proceeds of the Craft solely on her status as a lienor under the Act. The trustee and Johnston agree that a threshold question in determining whether Johnston possesses a maritime lien on the Craft is whether the Craft is a vessel under the Act. If the Craft is characterized as a vessel under the Act, then Johnston's lien comes within the admiralty jurisdiction pursuant to the Act.

A vessel is defined by statute as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 (U.S.C.A.1985). Johnston cites numerous cases broadly interpreting this definition to include any craft capable of being towed from one place to another, even as a barge. *See, e.g., M/V Marifax v. McCrory*, 391 F.2d 909 (5th Cir.1968); *Miami River Boat Yard, Inc. v. 60' Houseboat*, 390 F.2d 596 (5th Cir.1968) (craft withdrawn from navigation but still technically capable of being navigated termed a vessel under the Act); *In re Queen, Ltd.*, 361 F.Supp. 1009, 1013 (D.C.Pa.1973) (boat used as hotel and restaurant); *The Club Royale*, 13 F.Supp. 123 (D.N.J.1935) (boat without motors fastened to shore by ropes tied stem to stern); *The Showboat*, 47 F.2d 286, 287 (D.Mass.1930) (boat containing ready crew, mooring lines and chains which could be readily cast off in addition to easily disconnectable electrical wires); *The Ark*, 17 F.2d 446 (S.D.Fla.

1926) (boat without internal propulsion capability but not permanently attached to shore and capable of being towed deemed a vessel subject to admiralty jurisdiction). *But see Murray v. Schwartz*, 175 F.2d 72, 73 (2d Cir.1949) (contract of wharfage for ship withdrawn from navigation not within admiralty jurisdiction and therefore does not give rise to maritime lien); *Argues Shipyards v. The S.S. Charles Van Damme*, 175 F.Supp. 871, 872 (N.D.Cal. 1959) (craft permanently connected to mainland and operating as restaurant not a vessel).

From the foregoing cases, it may be seen that the definition of the term "vessel" turns on the permanence of the attachment of the particular boat to the shore. In the instant case, it is not disputed that the Craft was capable of being towed. The Craft had removable gangplanks and was tied to the river bank with mooring cables and ropes. These cables and ropes, as well as the Craft's electric and plumbing cables, were easily detachable. Further, Joseph Knue testified in his affidavit that the Craft was capable of being used as a barge, and that it could function as a tow boat. The Craft, in fact, had been towed three times since being converted to a restaurant, the last time after it was sold at auction. For these reasons, we conclude that the Craft is a vessel under the Act, and the assertion by Johnston of her lien therefore lies within the admiralty jurisdiction pursuant to the Act.

The mere fact that Johnston's claim lies within the admiralty jurisdiction, however, does not by itself determine whether the money she supplied to the debtor gives rise to a maritime lien. Johnston argues that she is entitled to a maritime lien under the Act for loaning money to the debtor that was used to purchase supplies and materials to convert the barge into a floating restaurant. She first contends that merely advancing this money to the debtor created a maritime lien, citing *Crustacean Transportation Corp. v. Atlanta Trading Corp.*, 369 F.2d 656, 660 (5th Cir.1967). She further bases the validity of her lien on the assertion that the

loaned money was used for "necessaries" pursuant to 46 U.S.C. §§ 31341 and 31342 of the Act.[3] She asserts that she loaned debtor $15,000.00 at the request of all the shareholders and an additional $9,000.00 at the request of Joseph Knue. She further states that her funds were used to repair the hull and to purchase materials, electrical service, pumps, permits, tools and other supplies used to convert the Craft into a floating restaurant. Johnston thus concludes that the money she loaned to debtor was used for these "necessaries," thereby giving rise to her maritime lien. Johnston cites numerous cases in support of the notion that labor and materials may be furnished for the conversion of a boat from one type to another, and that the boat need not be used for maritime purposes to give rise to a maritime lien for necessaries. *See, e.g., The Club Royale*, 13 F.Supp. 123 (D.N.J.1935) (showboat converted to restaurant a vessel giving rise to maritime lien); *The Showboat*, 47 F.2d 286, 287 (D.Mass. 1930) (boat used solely for entertainment purposes); *The Ark*, 17 F.2d 446, 448 (S.D.Fla.1926) (houseboat converted to supper club and dance hall a vessel subject to admiralty jurisdiction; labor and materials used in conversion were necessaries giving rise to maritime lien); *See also* 2 *Benedict on Admiralty*, § 38, at 3–36 (7th ed. 1992) (approving line of cases holding that craft still technically capable of being used in navigation is subject to Act; term "necessaries" should be construed broadly).

In contrast to the foregoing authority, we think that the broad interpretation accorded the term "vessel" in connection with the establishment of admiralty jurisdiction does not prompt the conclusion, as suggested by Johnston, that a maritime lien arises under the same broad statutory construction. Allowing liens on crafts having no maritime use contravenes the purposes for which maritime liens were intended. These purposes, rooted in maritime tradition, are to encourage capital investment in maritime ventures, ensure a ready supply of people to man sea-faring vessels, and to foster the furnishing of credit to these vessels and their crews for necessary services and supplies. 7A *Moore's Federal Practice*, para. .215[3], at 2341–42 (2d ed. 1988). Money used to convert a barge into a floating restaurant does not promote these purposes.

The Craft in the present case has been effectively withdrawn from navigation, and therefore, even assuming that the money Johnston provided was used for converting the Craft from a barge into a restaurant, a maritime lien cannot be deemed to have arisen since the vessel was not used in a maritime venture at the time the repairs to the Craft were made. *See In re River Princess Corp.*, 126 B.R. 837, 839 (Bankr.S.D.N.Y.1991); *Slavin v. Port Service Corp.*, 138 F.2d 386, 387–88 (3d Cir. 1943) (no maritime lien for wages if vessel withdrawn from navigation); *J.C. Penney-Gwinn Corp. v. McArdle*, 27 F.2d 324 (5th

**3.** 46 U.S.C. § 31341 and 31342 provide as follows:

**§ 31341. Persons presumed to have authority to procure necessaries**
(a) The following persons have authority to procure necessaries for a vessel:
(1) the owner;
(2) the master;
(3) a person entrusted with the management of the vessel at the port of supply; or
(4) an officer or agent appointed by—
(A) the owner;
(B) a charterer;
(C) an owner pro hac vice; or
(D) an agreed buyer in possession of the vessel.
(b) A person tortiously or unlawfully in possession or charge of a vessel has no authority to procure necessaries for the vessel.
**§ 31342. Establishing Maritime Liens**

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
(1) has a maritime lien on the vessel;
(2) may bring a civil action in rem to enforce the lien; and
(3) is not required to allege or prove in the action that credit was given to the vessel.
(b) this section does not apply to a public vessel.
46 U.S.C. § 31341 and 31342 were enacted in 1989 to replace the former 46 U.S.C. § 971. While the wording of the new maritime statute has changed, its substance remains unchanged. *Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1455 n. 3 (9th Cir.1989). Thus, the cases under the former statute retain their validity.

Cir.1928) (existence of maritime lien dependent upon maritime mode of usage of supplies and services when performed), *cert. denied sub nom., Lancaster Iron Works, Inc. v. J.C. Penney–Gwinn Corp.*, 278 U.S. 632, 49 S.Ct. 31, 73 L.Ed. 550 (1928). *See also* Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 8–1, at 250 (1987) ("[u]nder majority view, a vessel that is withdrawn from navigation may not be the object of a maritime lien). Moreover, the existence of a maritime lien must be strictly interpreted because it is a secret lien arising automatically without being filed. *River Princess Corp.*, 126 B.R. at 839. We therefore hold that Johnston may not assert a maritime lien for the money she loaned debtor to convert the Craft from a barge to a floating restaurant.

■■■ While Johnston is denied a maritime lien on the Craft, she nevertheless filed a financing statement. Had she not disavowed it in favor of her assertion of a maritime lien, that act might have given rise to a security interest in her favor in items of personal property located within the Craft.[4] As a jurisdictional matter, our finding that this case lies within the admiralty jurisdiction does not necessarily preclude the assertion of a lien for personal property under Ohio's version of the Uniform Commercial Code found in ORC §§ 1301–09. *See In re Topgallant Lines, Inc.*, 125 B.R. 682, 685 (Bankr.S.D.Ga.1991) (Uniform Commercial Code not superseded by Maritime Lien Act since Act only supersedes state statutes providing for enforcement of liens by civil actions against a vessel *in rem*).

■■■■ The Amended Complaint seeks avoidance of any such lien claimed by Johnston on the grounds that it is preferential, and, pursuant to 11 U.S.C. § 547, may be avoided. The undisputed facts show that plaintiff/trustee is entitled to succeed on this lien avoidance initiative. Johnston filed her U.C.C. financing statement four days before debtor filed its bankruptcy petition. Thus, as the trustee correctly argues, the filing of the Johnston financing statement has all of the indicia of a preferential transfer pursuant to 11 U.S.C. § 547(b). Section 547(b) provides that a trustee may avoid a transfer of an interest of the debtor in property when the transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor to receive if—

(A) the case were a case under chapter 7 of this title;

(B) such creditor received payment of such debt to the extent provided by the provisions of this title.

Johnston's filing of a financing statement is a transfer of benefit, because the granting of a security interest improves the position of the grantee with respect to general unsecured creditors. *In re Compton Corp.*, 831 F.2d 586, 594–95 (5th Cir. 1987). Next, the transfer was made on account of an antecedent debt owed to Johnston in that the financing statement was intended to secure loans made by Johnston to debtor in 1987, four years before the filing date. Further, debtor was insolvent at the time the financing statement was filed on October 7, 1991, four days before debtor filed its Bankruptcy petition. Section 547(f) provides that a debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition. In the absence of evidence to meet or rebut the presumption of insolvency, the trustee may rely upon the presumption in his favor. 4 *Collier on Bankruptcy*, para. 547.07, at

---

4. We note here that while Johnston now wishes to disavow the filing of the financing statement because she finds it inconsistent with her assertion that she has a maritime lien, the fact remains that she did file the financing statement and it remains a part of the record in this case.

547–39 (citing *In re Emerald Oil Co.*, 695 F.2d 833, 838 (5th Cir.1983)). Finally, the recognition of Johnston's financing statement as a document relating to the creation of a security interest would allow her to realize more here than she would in a liquidation under chapter 7, since she would recover her whole claim if she were deemed secured. Thus, Johnston's filing of a financing statement is preferential and may be avoided by the trustee.

In sum, then, Johnston may not assert a maritime lien nor does she possess a valid security interest under Ohio's version of the Uniform Commercial Code. Her claim therefore will be treated as a general unsecured claim, and she will be entitled to share in the distribution to unsecured creditors on a pro-rata basis. Finally, Johnston's request for attorneys' fees will also be denied.

### Conclusion

After consideration of the legal and factual issues in this matter, we find that Karen Bauer has a valid lien in the amount of $5,000.00. The claim of O. Jane Johnston is unsecured, and she will share in the distribution to unsecured creditors on a pro-rata basis. Her request for attorneys' fees will also be denied.