**In re Kenneth E. EYERMAN, Christi Ann Eyerman, Debtors.**

No. 13–52136.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Signed Sept. 18, 2014.

Entered Sept. 19, 2014.

Crystal I. Zellar, Zellar & Barclay, Attorneys at Law, Inc., Zanesville, OH, for Debtors.

## MEMORANDUM OPINION AND ORDER GRANTING DEBTORS' MOTION FOR SUMMARY JUDGMENT AND OVERRULING OBJECTION TO CONFIRMATION OF THE PROGRESS FUND

C. KATHRYN PRESTON, Bankruptcy Judge.

This cause came on for consideration of Debtors' Motion for Summary Judgment (the "Motion") (Doc. # 52), and Progress Fund's Memorandum in Opposition to Debtors' Motion for Summary Judgment (Doc. # 54). Debtors seek a summary decision on Progress Fund's objection to confirmation of Debtors' Chapter 13 Plan.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and General Order 05–02 entered by the United States District Court of the Southern District of Ohio, referring all bankruptcy matters to this Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## I. Standard of Review for Motions for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment must illustrate that the facts are not genuinely disputed by pointing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[.]" Fed.R.Civ.P. 56(c)(1). The party seeking summary judgment bears the initial burden of "informing the . . . court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also* Fed.R.Civ.P. 56(c)(3).

If the movant satisfies this burden, the nonmoving party may not rest on its pleading, but similarly must, by citation to particular parts of the record, demonstrate that a fact or facts are subject to dispute. Fed.R.Civ.P. 56(c)(1). The mere allegation of a factual dispute is not sufficient to defeat a motion for summary judgment; to prevail, the non-moving party must show that there exists some genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must deem as true the nonmovant's evidence and must view all justifiable infer-

ences in a light most favorable to the nonmoving party. *Matsushita Elec Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

The Sixth Circuit Court of Appeals has articulated the following standard to apply when evaluating a motion for summary judgment:

> [T]he moving [party] may discharge its burden by "pointing out to the . . . court . . . that there is an absence of evidence to support the nonmoving party's case." The nonmoving party cannot rest on its pleadings, but must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial. Although we must draw all inferences in favor of the nonmoving party, it must present significant and probative evidence in support of its complaint. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."

*Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir.1997) (internal citations omitted). A material fact is one whose resolution will affect the determination of the underlying action. *Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir.1996). An issue is genuine if a rational trier of fact could find in favor of either party on the issue. *Schaffer v. A.O. Smith Harvestore Prods., Inc.*, 74 F.3d 722, 727 (6th Cir.1996) (citation omitted).[1] "The substantive law determines which facts are 'material' for summary judgment purposes." *Hanover*

---

1. Nonetheless, the Court is not required to "speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111(6th Cir.1989).

*Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir.1994) (citations omitted). However, determinations of credibility, weight to be given the evidence, and inferences to be drawn from the facts remain the province of the trier of fact. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

In determining whether each party has met its burden, the court must keep in mind that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. If otherwise appropriate, summary judgment may also be entered for a nonmoving party. *K.E. Resources, LTD. v. BMO Fin. Inc. (In re Century Offshore Mgmt. Corp.)*, 119 F.3d 409, 412 (6th Cir.1997); *see also Celotex*, 477 U.S. at 326, 106 S.Ct. 2548 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."). *See also* Fed. R Civ. P. 56(f).

## II. Procedural Background

Kenneth E. Eyerman and Christi A. Eyerman (hereinafter, "Debtors") filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.[2] Debtors listed The Progress Fund (hereinafter, "Progress") as a secured creditor on Schedule D, acknowledging that it holds two mortgages on certain real property. In due course, Debtors filed a proposed Chapter 13 Plan, which was amended a number of times culminating in the Third Amended Chapter 13 Plan (hereinafter, the "Plan") (Doc. # 55). The Plan provides, as did all previous plans proposed by Debtors, that the real property subject to Progress' mortgages will be surrendered, and, after Progress completes the liquidation process, any resulting deficiency balance will be treated as a general unsecured claim.

Progress timely filed an objection to confirmation of the Plan (hereinafter, the "Objection") (Doc. # 23).[3] In short, Progress asserts that, in addition to the mortgages it holds, it also holds a lien on all of Debtors' personal property, and that the Plan fails to treat its secured claim properly in light of this security interest.[4]

Debtors filed the instant Motion, asserting that there are no genuine issues of fact, and that based upon the facts, as a matter of law, Debtors are entitled to a decision in their favor overruling Progress' Objection. Debtors have filed an affidavit in support of the Motion, and copies of various relevant documents from the credit transactions described below. Progress has relied solely on the documents submitted by Debtors; Progress has not submitted any sworn statements in support of its position.

## III. Findings of Fact

The facts upon which this case may be resolved are not in dispute and may be summarized as follows:

Prior to commencement of this Chapter 13 case, Debtors were the owners of two Ohio limited liability companies known as Eyerman Enterprises, Ltd (hereinafter, "Enterprises") and Zane Trace Inn, LLC

---

2. Unless otherwise indicated, all statutory references are to sections of the Bankruptcy Code, codified in Title 11 of the United States Code.

3. Pursuant to Local Bankruptcy Rule 3015–3(a), a timely filed objection to confirmation remains pending despite amendments to the chapter 13 plan, until the objection is withdrawn or decided by order of court.

4. Progress asserted several additional objections, but most of them hinge on Progress' alleged lien on Debtor' personal property. See footnote 12.

(hereinafter, "Zane Trace"). Enterprises was formed in 2006 for the purpose of operating a bed and breakfast enterprise in Somerset, Ohio, known as the Zane Trace Inn. At the outset of the relationship with Progress, Debtors owned the real estate on which the inn was operated (hereinafter, the "Somerset Property").

In September 2006, Enterprises and Debtors obtained a loan from Progress in the amount of $125,000.00, to finance the start-up of the bed and breakfast operation. Enterprises and both Debtors, in their individual capacity, executed the promissory note (hereinafter, the "2006 Note") and a loan agreement (hereinafter, the "2006 Loan Agreement"). To secure payment of the note, Debtors executed an Open End Mortgage (hereinafter, the "2006 Mortgage"), granting to Progress a mortgage lien on the Somerset Property, and Enterprises executed a Security Agreement (hereinafter, the "2006 Security Agreement"), granting Progress a security interest in Enterprises' personal property. The first paragraph of the 2006 Security Agreement states, "THIS SECURITY AGREEMENT is entered into between EYERMAN ENTERPRISES, LTD., an Ohio limited liability company, of 129 West Main Street, Somerset, OH 43783 ('Borrower'), and THE PROGRESS FUND, a Pennsylvania non-profit corporation ... ('Lender')." Thus, the first page of the 2006 Security Agreement defines Borrower to include only Enterprises. After certain recitals, the next paragraph states "Borrower grants to Lender a purchase money security interest in the Collateral to secure the Indebtedness. . . ." In section 1 of the document, titled "DEFI-NITIONS," the term "Collateral" is defined to mean "all personal property of the Borrower. . . ." That section also defines the term "Note" as the 2006 Note and acknowledges that the 2006 Note was "from Borrower, Kenneth E. Eyerman and Christi A. Eyerman to Lender. . . ." Only

Enterprises executed the 2006 Security Agreement. This is clearly as intended: the signature block for Enterprises appears as follows:

BORROWER:

EYERMAN ENTERPRISES, LTD.,
an Ohio limited liability company
By: /s/ Christi A. Eyerman (Seal)

Under the signature line, Ms. Eyerman handwrote her full name and the word "member," describing her business capacity with the company. There are no signature blocks or other indicia that Debtors were supposed to or expected to execute the 2006 Security Agreement.

The lien granted by the 2006 Security Agreement was perfected by the filing of a UCC Financing Statement with the Ohio Secretary of State on February 29, 2006 (hereinafter, the "2006 Financing Statement"). On the 2006 Financing Statement, in the block titled "DEBTOR'S EXACT FULL LEGAL NAME" is inserted Enterprises' full name. In the block titled "ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME" is inserted Kenneth Eyerman's full name. On a subsequent page of the financing statement, in a block titled "ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME" is inserted Christi Eyerman's full name.

In 2008, Debtors formed Zane Trace Inn, LLC for the purpose of providing property management services, including management of the Somerset Property. In early 2009, Debtors conveyed the Somerset Property to Zane Trace, with the knowledge and consent of Progress.

In July 2009, Enterprises and Zane Trace obtained a second loan from Progress in the amount of $118,691.00. Enterprises and Zane Trace both executed the promissory note (hereinafter, the "2009 Note") and a loan agreement (hereinafter, the "2009 Loan Agreement"). To secure payment of the note, Zane Trace executed

a mortgage (hereinafter, the "2009 Mortgage"), granting to Progress a second mortgage lien on the Somerset Property. Zane Trace also executed a Security Agreement (hereinafter, the "2009 Security Agreement"), granting Progress a security interest in Zane Trace's personal property utilized in operation of the bed and breakfast. The first paragraph of the 2009 Security Agreement states, "THIS SECURITY AGREEMENT is entered into between ZANE TRACE INN, LLC, an Ohio limited liability company, of 129 West Main Street, Somerset, OH 43783 (the 'Borrower'), and THE PROGRESS FUND, a Pennsylvania non-profit corporation ... ('Lender')." Thus, the first page of the 2009 Security Agreement specified that the term "Borrower" included only Zane Trace. After certain recitals, the next paragraph states, "Borrower grants to Lender a purchase money security interest in the Collateral to secure the Indebtedness. . . ." In section 1 of the document, titled "DEFINITIONS," the term "Collateral" is defined to mean "all personal property of the Borrower. . . ." That section also defines the term "Note" as the 2009 Note and acknowledges that it was "from Borrower and Eyerman Enterprises, Ltd. to Lender. . . ." Only Zane Trace executed the 2009 Security Agreement. There are no signature blocks or other indication that Debtors were supposed to or expected to execute the 2009 Security Agreement. Enterprise did not sign the 2009 Security Agreement, or any other security agreement in connection with the 2009 transaction.

The lien granted by the 2009 Security Agreement was perfected by the filing of a UCC Financing Statement with the Ohio Secretary of State on July 20, 2009 (hereinafter, the "2009 Financing Statement"). On the 2009 Financing Statement, in the block titled "DEBTOR'S EXACT FULL LEGAL NAME" is inserted Enterprises' full name. In the block titled "ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME" is inserted Zane Trace's full name.

The only document executed by Debtors (in their individual capacity) in connection with the 2009 loan was a Guaranty and Suretyship Agreement (hereinafter, the "Guaranty"). This agreement guaranteed payment to Progress of the 2009 Note and performance by Enterprises and Zane Trace of the other terms contained in the 2009 Loan Agreement. The Guaranty does not contain any reference to any collateral whatsoever and does not purport to be a security agreement.

## IV.  Law and Analysis

The 2006 Loan Agreement, 2006 Security Agreement and 2006 Mortgage specify that the law of Ohio governs the transaction between the parties. Although the 2006 Note does not so specify, it is evident that the parties intended Ohio law to apply, and no one has suggested to the contrary.

The Ohio Revised Code provides in pertinent part:

(A) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones time of attachment.

(B) Except as otherwise provided in ... this section, a **security interest** is **enforceable** against the debtor ... with respect to the collateral, **only if:**

(1) Value has been given;

(2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(3) ...

(a) The debtor has **authenticated a security agreement** that provides a description of the collateral. . . .

Ohio Rev.Code § 1309.203 (emphasis added). The parties do not contest whether value has been given or whether the Debtors would have the power to transfer rights in assets. The question is simply whether Debtors granted a security interest in their personal property in connection with the 2006 loan.

Progress relies on two theories: first, Progress asserts that the 2006 Security Agreement and 2006 Financing Statement grant Progress a security interest in Debtors' personal property. Second, Progress insists that the totality of the documents related to the transaction illustrate that the parties intended that Debtors grant Progress a security interest in their personal property.

### A. The Security Agreement and Financing Statement Do Not Grant Progress a Security Interest.

A security agreement is a contract. As such, a security agreement is subject to the same rules of interpretation which apply to contracts generally. *See, e.g., Ogan v. Ogan,* 122 Ohio App.3d 580, 702 N.E.2d 472, 474 (1997) (mortgages are subject to "the same rules of interpretation and the same framework of analysis which apply to contracts generally."). In interpreting the 2006 Security Agreement, therefore, the Court will apply the legal principles governing the interpretation of contracts in Ohio. As articulated by the Ohio Supreme Court,

> When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement. We examine the ... contract as a whole and presume that the intent of the parties is reflected in the language used in the [contract]. We look to the plain and ordinary meaning of the language used ... unless another meaning is clearly apparent from the contents of the [contract]. *When the*

*language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.* As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. *Cincinnati Ins. Co. v. CPS Holdings, Inc.,* 115 Ohio St.3d 306, 875 N.E.2d 31, 33 (2007) (citations and internal quotations marks omitted) (emphasis added). The interpretation of an unambiguous contract "is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.,* 15 Ohio St.3d 321, 474 N.E.2d 271, 272 (1984). "A contract does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 678 N.E.2d 519, 526 (1997) (internal quotation marks omitted). Moreover, "[i]t is not the responsibility or function" of the Court to rewrite the terms of an unambiguous contract in "order to provide for a more equitable result." *Foster Wheeler Enviresponse,* 678 N.E.2d at 526.

The scope of the term "Borrower" in the 2006 Security Agreement was unequivocally limited to Enterprises in the very first paragraph of the document. Progress suggests that language in paragraph A of the Recitals in the document indicates that the term "Borrower" included Debtors. This is without merit: the language on which Progress relies states in pertinent part:

> Borrower, Kenneth E. Eyerman and Christi A. Eyerman have executed a Promissory Note and a Loan Agreement with Lender [Progress] ... under which Lender ... has agreed to extend credit to Borrower and the others[.]

Basic rules of grammar mandate the interpretation of this paragraph. There is no

comma after Christi Eyerman's name, as there would be if Kenneth's and Christi's names were present in order to describe what is encompassed by the term "Borrower." Lacking the comma, the proper reading of the beginning phrase of the paragraph is "Borrower and Kenneth E. Eyerman and Christi A. Eyerman have executed...." Moreover, if the term "Borrower" included Debtors, then the phrase "and the others" at the end of the paragraph would be unnecessary surplusage. Similarly, in section 1 of the document, the term "Note" is defined as "the Promissory Note ... from Borrower, Kenneth E. Eyerman and Christi A. Eyerman to Lender...." Again, lacking the comma after Christi's name, the only proper reading of the paragraph is that the term "Note" means "the Promissory Note ... from Borrower and Kenneth E. Eyerman and Christi A. Eyerman to Lender...." The 2006 Security Agreement was executed solely by Enterprises. It was not executed by Debtors, nor is there any indication in the document that there was an intention that they do so. The document did not have a signature block for Debtors to sign, nor blanks for their initials. Clearly, the 2006 Security Agreement unambiguously provides that the only Borrower is Enterprises and that as Borrower, only Enterprises was granting a lien on its personal property. Progress' theory that the term "Borrower" in the Security Agreement includes Debtors is implausible.

▮▮▮▮ Nor does the 2006 Financing Statement solve Progress' problem. The document does not contain any language granting a security interest. It is a simple, straight forward form containing on the names and addresses of parties, and a description of collateral. Although no special language is required to grant a security interest, *Silver Creek Supply v. Powell*, 36 Ohio App.3d 140, 521 N.E.2d 828, 832 (1987), this does not mean that no language is required. As noted by the First Circuit Court of Appeals: "[T]he function of a financing statement is merely to put third parties on notice that the secured party who has filed it *may* have a perfected security interest in the collateral described. A financing statement alone does not establish that in fact a security interest has been agreed upon." *In the Matter of Numeric Corp.*, 485 F.2d 1328, 1331–32 (1st Cir.1973). "[A] standardized financing statement, unsupported by other documentation, is intended merely to serve as notice to the general public and was not borne out of an attempt by the legislature to constitute a security agreement." *Silver Creek Supply*, at 833 (citations omitted). *See also Steego Auto Parts Corp. v. Markey*, 2 Ohio App.3d 200, 441 N.E.2d 279, 282 (1981) (indicating that there must be language in a document which leads to the conclusion that it was the intention of the parties to create a security interest).

Thus, it is clear that the 2006 Security Agreement and the 2006 Financing Statement by themselves do not grant Progress a security interest in any of Debtors' assets. But the inquiry does not end there.

**B. The Totality of the Documents Do Not Illustrate That Debtors Intended to Grant Progress a Security Interest in Personal Property nor Provide the Foundation for a Security Interest.**

▮▮▮▮ It is well settled in Ohio that a security interest may be granted through any written document or documents that manifest the parties' intention to create a security interest. The document need not be titled "Security Agreement" or something similar, nor is particular language required. *Silver Creek Supply*, 521 N.E.2d at 832. However, there must be some indication that the parties intended for a security interest to be granted AND

the documents must provide the "foundation for recognition of the creation, perfection and enforcement of a security interest." *Id.* at 834. This may derive from a review of all of the related documents in the loan transaction. This is referred to as the "composite document approach,"[5] and Progress posits that a review through this lens demonstrates that the parties intended that Debtors grant Progress a security interest. The court's role in this instance is to "examine[ ] all the documents executed between a debtor and a creditor to determine, if taken together, whether the 'writing or writings, regardless of label, . . . adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon. . . .' " *Drown v. Perfect (In re Giaimo)*, 440 B.R. 761, 769 (6th Cir. BAP 2010) (quoting *Belfance v. Buonpane (In re Omega Door Co., Inc.)*, 399 B.R. 295, 306 (6th Cir. BAP 2009)), *aff'd* 2013 U.S.App. LEXIS 26064 (6th Cir., Jan. 31, 2013). *See also Numeric Corp.*, 485 F.2d at 1331.

Progress points to various related documents and attempts to describe how they each support Progress' theory: Progress asserts that the 2006 Note identifies Debtors as well as Enterprises with the term "Borrower," and that page 3 of the Note states that the Note is secured by "certain business assets . . . as set forth and described in the Security Agreement between Lender and Borrower. . . ." Progress asserts that the 2006 Loan Agreement also identifies Debtors and Enterprises collectively as "Borrower" and "provides a security interest"[6] in paragraph 2. Progress asserts that the 2006 Security Agreement identifies Debtors as "Borrower" and effectively grants Progress a security interest in Debtors' personal property. Progress asserts that the 2006 UCC Financing Statement lists Debtors individually as "DEBTOR" along with Enterprises and identifies a security interest in Debtors' personal property. Finally, Progress asserts that in connection with the 2009 Note, Progress required Debtors to execute the Guaranty, indicative that Progress intended to hold Debtors personally liable for the loans.

The various documents do not avail Progress. The Court will address the documents in reverse order.

Undoubtedly, by requiring a Guaranty from Debtors, Progress intended for Debtors to be personally liable for the debt to Progress. The Guaranty may have indeed accomplished this.[7] However, the Guaranty does not state, or even intimate, that Debtors have granted a security interest in their assets, or otherwise bear on the same. It certainly does not purport to grant a security interest in any of Debtors' assets. The mere fact that Debtors may have liability to Progress by virtue of the Guaranty does not equate to a lien nor indicate that Debtors intended to grant one.

The content and proper interpretation of the 2006 Security Agreement have already been discussed above. The 2006 Security Agreement contains absolutely no indication that Debtors were granting or intended to grant a security interest in their personal property.

Progress quotes paragraph 2 of the 2006 Loan Agreement, wherein it states that (i) security for the loan shall include collateral, guaranties, and other documents previously, contemporaneously or later execut-

---

**5.** *Drown v. Perfect (In re Giaimo)*, 440 B.R. 761, 768–69 (6th Cir. BAP 2010).

**6.** Progress Fund's Mem. In Opp. To Debtors' Mot. Summ. J. at 8 (Doc. # 54).

**7.** The Court is not deciding, and need not decide, the legal effect of the Guaranty as it pertains to Debtors' liability to Progress.

ed and (ii) all obligations shall be cross-collateralized and cross-defaulted, "such that collateral securing any Obligation shall secure repayment of all Obligations...." Progress has quoted the 2006 Loan Agreement accurately, but mischaracterizes the document when Progress states that the document provides a security interest. To the contrary, the Loan Agreement makes no reference to Debtors or Borrowers executing a security agreement; the Loan Agreement merely makes general reference to security documents which *may* be executed. The term "collateral" is not defined, nor is there a sufficiently specific description of what constitutes the collateral. The document also expresses an intention that various credit facilities between the parties be cross-collateralized and cross-defaulted. This language does not indicate that Debtors intended to grant a security interest in more than the Somerset Property, or, more specifically, in their personal property. An expression of an intention to cross-collateralize and cross-default loan documents does not translate into an expression of an intention to grant a lien on assets.

The 2006 Financing Statement may be somewhat indicative of an intent to grant a security interest, until one considers the 2009 Financing Statement. As previously explained, the 2009 Note was executed by Enterprises and Zane Trace. The 2009 Security Agreement was executed solely by Zane Trace; Enterprises did not execute any security agreement to secure the 2009 Note. Yet the 2009 Financing Statement names Enterprises as a debtor as well as Zane Trace. Inasmuch as the composition of the related documents duplicates the composition of the documents in the 2006 transaction (i.e., Debtors and Enterprises executed the 2006 Note; Debtors did not execute any security agreement, but yet were named on the 2006 Financing Statement as debtors as well as Enterprises), it is apparent that the Progress' template for preparation of a UCC financing statement was to denote all of the borrowers signing the note as debtors on the financing statement. This being the case, the 2006 Financing Statement is not indicative of the parties' intent to create a security interest in Debtors' personal property.

The only document which gives the Court pause is the 2006 Note. As pointed out by Progress, the Note states that it is secured by, among other things not relevant here, "certain business assets and general intangibles as set forth and described in the Security Agreement between Lender and Borrower...." And, indeed, the term "Borrower" as used in the 2006 Note includes Debtors. Does this indicate an intention to create a security interest and provide the foundation for recognition of a security interest? Progress insists yes, and relies on the case of *Bavely v. Wandstrat (In re Harbour Lights Marina, Inc.)*, 146 B.R. 963 (Bankr. S.D.Ohio 1992).

In *Harbour Lights*, the secured creditor had a promissory note signed by the debtor and a financing statement describing assets of the debtor. The financing statement was signed by the creditor (who was also an officer of the debtor), but not by the debtor.[8] No security agreement was executed by the debtor. The debtor filed bankruptcy, and the chapter 7 trustee asserted that, in the absence of an executed

---

**8.** *Harbour Lights* was decided in 1992. At that time the Ohio Revised Code ("ORC") required UCC financing statements to be signed by the owner of the collateral described therein. Following extensive revisions to Article 9 of the Uniform Commercial Code, in 2001, Chapter 1309 of the ORC (in which UCC Article 9 is codified in Ohio) was similarly extensively revised. Among many other changes, the requirement that financing statements be signed was deleted.

security agreement, the creditor did not have a valid security interest in the debtor's assets. However, the debtor's president attested that the debtor intended to grant a security interest in its personal property. He also attested that he had signed the financing statement after carefully reading it.[9] The court found that the combined effect of the note, financing statement and sworn statement of the debtor illustrated the debtor's intent to grant a security interest in the debtor's personal property, and the documents and sworn statement of the debtor explained the scope of the security interest. The court also found that the signature of the creditor on the financing statement sufficed for the debtor's signature, in light of the testimony of the debtor's president and the position that the creditor held as an officer of the debtor.

The instant case differs materially from *Harbour Lights*. Although Debtors' signatures appear on the 2006 Note, there is no evidence in the record that they authorized the filing of the 2006 Financing Statement.[10] Moreover, in an affidavit filed in support of the Motion, Debtors adamantly refute that they intended to grant a security interest in their personal property. Progress submitted no sworn statement or other declaration to the contrary. Although Progress is absolutely correct that the intent of the parties can be gleaned from all of the related documents, the related documents must also provide the foundation of a grant of a security interest.

The case of *In the Matter of Bollinger Corporation,* 614 F.2d 924 (3rd Cir.1980) is instructive.

In the *Bollinger* case, the debtor, Bollinger Corporation ("Bollinger"), borrowed money from Zimmerman & Jansen, Inc., and executed a promissory note and financing statement. Although the promissory note indicated that the parties intended to execute a security agreement, that was all that the note accomplished relative to a security interest. The court declined to find that the note and financing statement together illustrated the existence of a security agreement, since the note contained language only indicating that the parties intended to execute a separate security agreement, it did not purport to be a security agreement, and it lacked the specificity to serve in that capacity. The court further recognized that "a financing statement provides only an inferential basis for concluding that the parties intended a security agreement." *Bollinger,* 614 F.2d 924, 928. Thus, the note and financing statement, without more, failed to establish the foundation for a security interest.[11]

In the instant case, even if the 2006 Note and 2006 Financing Statement together illustrate an intention of the parties that Debtors grant a security interest in their personal property, the documents fail to provide the foundation for a security interest. The 2006 Note states that the note is secured by, among other things,

---

**9.** No explanation was given why the court found that the financing statement was not signed by the debtor, but the debtor's president testified that he had signed it.

**10.** Although the Ohio Revised Code no longer requires financing statements to be signed by the entity that owns the collateral, the entity granting a security interest must authorize the filing of a financing statement in "an authenticated record." Ohio Rev.Code § 1309–509(A).

**11.** Reviewing various correspondence between the parties ultimately led the *Bollinger* Court to conclude that the parties intended a security agreement, and that the correspondence together with the provisions of the note and description of the collateral in the financing statement met the requirements of the UCC.

"certain business assets and general intangibles as set forth in the Security Agreement between Lender and Borrower, of even date herewith. . . ." As in *Bollinger*, the 2006 Note merely indicates that the parties may have intended to execute a security agreement, but it does not purport to be the security agreement and it lacks the specificity required to serve as a security agreement. The 2006 Note uses the term "certain business assets" to describe the intended collateral. The Ohio Revised Code specifically states that such vague descriptions are insufficient: "A description of collateral as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral." Ohio Rev.Code § 1309.108(c). Additionally, the language in the Note indicates that only *certain* business assets were to be the subject of a security agreement, not necessarily *all* business assets were to be included. Debtors' assets consist of consumer assets (household goods and furnishings, clothing, some guns, jewelry, insurance policies, and a state retirement plan), the equity interests in Enterprises, Zane Trace and two other limited liability companies, several vehicles, semi tractors and trailers, farm equipment and implements. *See* Debtors' Schedule B (Doc. # 1). In addition to operation of the Zane Trace Inn, Debtors also operate a farm, Debtor Kenneth Eyerman is a consultant, and Debtor Christi Eyerman is a teacher. In any or all four of those capacities, Debtors could own equipment and assets pertaining to their various occupations. Thus, the purported collateral is not reasonably identified. Moreover, as mentioned above, Debtors belied any intent to grant a security interest in their personal property. As previously discussed, the other related documents fail to establish the intention to create a security agreement or to serve as a security agreement. Accordingly, the documents fail to provide the foundation necessary to create a security interest in Debtors' personal property.

### C. The Remaining Bases of Progress' Objection Are Without Merit.

Most of the remaining bases for Progress' Objection hinge on whether Progress' security interest extends to Debtors' personal property.[12] Having found that it does not, those remaining objections put forth by Progress are moot. The last objection interposed by Progress is that the Plan fails to provide for payment of Progress' deficiency after liquidation of the Somerset Property. This is simply not accurate; section B(5) of the Plan specifically so provides.

## V. Conclusion

There are no issues of material fact: The documents related to the 2006 loan transaction between Debtors and Progress do not grant Progress a security interest in personal property of Debtors, nor do the documents illustrate that Debtors intended to grant Progress a security interest in their personal property or provide the foundation for creation of a security interest. Lacking a security interest in Debtors' personal property, Progress' Objections to confirmation of the Plan are without merit. Debtor's are, therefore, entitled to an order overruling the Objection as a matter of law. Accordingly, it is

---

12. Additional bases for the Objection are (1) Debtors failed to disclose Progress' security interest in Debtor's personal property in their Schedules, (2) Debtors failed to properly disclose their liability to Progress in their Schedules, (3) the Plan fails to provide that Progress retains its lien pursuant to § 1325, (4) the Plan fails to provide adequate protection payments to Progress, (5) the Plan fails to provide for sale of Debtors' personal property in order to pay Progress' secured claim.

**ORDERED and ADJUDGED** that the Progress' Objection to confirmation of Debtors' Chapter 13 Plan is **OVERRULED.**

**IT IS SO ORDERED.**